**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**EMMANUEL J. CASIANO, M.D.**

        **Plaintiff,**

**v.**                                     **Case No. 3:04CV67/RV/MD**

**ALBERTO GONZALES, in his official
capacity as United States Attorney
General, Department of Justice,
Federal Bureau of Prisons,**

        **Defendant.**

_____

## ORDER

    Plaintiff Emmanuel J. Casiano brought this action against Defendant Alberto Gonzales in his official capacity as United States Attorney General, alleging claims of national origin discrimination and retaliation under Title VII of the Civil Rights Act of 1964 [42 U.S.C. § 2000e, et seq.] and age discrimination under the Age Discrimination in Employment Act of 1967 [29 U.S.C. § 621, et seq.]. The Defendant has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Doc. 47) Unless otherwise noted, the following facts appear to be undisputed in the record.

**I.    FACTUAL BACKGROUND**

    Emmanuel J. Casiano ("Casiano") is a 76 year old orthopedic surgeon born in the commonwealth of Puerto Rico. In the year 2000, Casiano became Clinical Director for the Federal Prison Camps located at Eglin Air Force Base ("FPC Eglin") and

Pensacola Naval Air Station ("FPC Pensacola").[1] At that time he was 71 years old. As Clinical Director, Casiano was responsible for providing medical care to the approximately 900 inmates at FPC Eglin and the 500 inmates at FPC Pensacola. Casiano was also responsible for implementing Bureau of Prisons ("BOP") healthcare policies at FPC Eglin/Pensacola, and for supervising the camp's mid-level practitioners ("MLPs") --- doctors, dentists, nurses, technicians, and physician assistants --- who provided medical care to the prisoners.

While the MLPs were under Casiano's medical supervision, they were under the administrative supervision of the camp's Health Services Administrator, who provided technical, logistical, and administrative support. During the period in question, Arlene Balinao was Health Services Administrator for FPC Eglin. Both Casiano and Balinao were under the immediate supervision of the camp's Associate Warden, who in turn reported to the Warden. When Casiano started at FPC Eglin/Pensacola, Jose M. Vasquez ("Warden Vasquez"), a Puerto Rican born Hispanic, was the Warden for FPC Eglin and FPC Pensacola. Floretino Morlote, a Cuban born Hispanic, was Associate Warden ("AW Morlote") for FPC Eglin. In May of 2003, Warden Vasquez and AW Morlote were reassigned, and were replaced by Donald F. Bauknecht ("Warden Bauknecht") and Eddie Jacobsen ("AW Jacobsen"), respectively.

The BOP is structured along regional lines, with FPC Eglin and FPC Pensacola falling in the BOP's Southeast Region of the United States. Each region has its own Regional Director, who has his own staff, including a regional Health Services Administrator. During the period in question, the BOP's Southeast Regional Director was Raymond Holt ("Regional Director Holt"). On April 7, 2002, Lillian Jimenez ("Jimenez"), a Puerto Rican born Hispanic, became the Southeast Regional Health

---

[1] FPC Eglin and FPC Pensacola operate according to a "shared services" procedure, under which the two camps share a single Warden and Clinical Director. Casiano's job as Clinical Director for both camps required him to spend part of each week at FPC Eglin and part at FPC Pensacola.

Services Administrator.[2] The highest ranking medical officer in the BOP is the Medical Director, who is stationed in Washington, D.C. During the period in question, the Medical Director for the BOP was Captain Newton Kendig ("Captain Kendig").[3]

To practice medicine at a BOP facility, a physician must be granted privileges. A MLP's privileges are under the control of the Clinical Director at a given institution, and may be granted or revoked at his discretion. A Clinical Director's privileges are under the control of the Medical Director, who has sole discretion to determine whether to grant privileges. When Casiano became Clinical Director for FPC Eglin and FPC Pensacola, he was given privileges for a two year period ending in December of 2002.

As Clinical Director, Casiano was subject to quarterly evaluations by AW Morlote, with a formal evaluation conducted yearly. Associate Wardens are typically not doctors, however, and are thus ill equipped to evaluate a Clinical Director's medical competence. To remedy this, Captain Kendig instituted in 2001 a formal BOP peer review process under which each Clinical Director would be evaluated prior to the renewal of his or her privileges to determine competence and compliance with BOP policies and procedures. The evaluation took the form of a peer review conducted by a medical doctor of Captain Kendig's choice.[4] According to an agenda prepared by Captain Kendig, the peer review process called for an in-depth onsite evaluation, a records review, and interviews with other personnel at the institution.

---

[2] Prior to this, Jimenez had served as the Health Services Administrator for the Marianna Federal Correctional Institution during the period when Casiano was Clinical Director for that facility. See infra.

[3] Captain Kendig is an officer in the United States Public Health Service detailed to the BOP.

[4] The peer review program called for the reviewer to be selected in consultation with the Warden, Regional Health Services Administrator and the Region's Clinical Speciality Consultant. Preferably, the Clinical Consultant covering a particular region would perform the peer reviews for the Clinical Directors in that region. However, because of the limited number of reviews a Clinical Speciality Consultant could perform per year, it was anticipated that other doctors would also be used. In this case, it appears that Captain Kendig selected Dr. Ramirez to perform the review without consulting with Warden Vasquez, Jimenez, or the Region's Clinical Speciality Consultant.

Casiano's peer review was conducted in May of 2002 by Dr. Richard Ramirez ("Dr. Ramirez"), a regional clinical consultant with the BOP. Dr. Ramirez found that while Casiano had shown sufficient knowledge and skills in his specialty of orthopedic surgery, he processed inadequate knowledge of internal medicine. As a result, Dr. Ramirez found that Casiano was unable to provide adequate supervision to the MLPs at FPC Eglin, and was forced to either defer to their conclusions or seek the advice of an outside specialist. The report also found that Casiano lacked the necessary leadership skills for his job as Clinical Director, that he was unwilling to discipline MLPs at FPC Eglin, and that he was generally not respected by MLPs at the camp.

It appears that the peer review conducted by Dr. Ramirez deviated from the agenda promulgated by Captain Kendig in a few respects. The official agenda for the peer review called for Dr. Ramirez to spend four hours with Casiano on day one and half an hour with him on day two of the review. Casiano contends that he did not do so.[5] Dr. Ramirez interviewed MLPs at the camp, though this was not listed as a part of the official agenda.[6] It also appears that Dr. Ramirez selected the cases for his review, whereas the official agenda calls for the Clinical Director to select the cases. Casiano contends that Dr. Ramirez refused to speak Spanish with him during the review, and that he had been told Dr. Ramirez was the BOP's "hatchet-man" and that he had a history of giving negative peer reviews to Hispanic doctors.[7]

Dr. Ramirez reported his findings orally to Warden Vasquez and AW Morlote

---

[5] In his Statement of Disputed Facts, Plaintiff states that "Dr. Ramirez spent no time with Dr. Casiano" during the review. (Doc. 66, at 23). This is contradicted by the record, which indicates that Dr. Ramirez quizzed Casiano on various aspects of his medical knowledge. Casiano has also claimed bias from Dr. Ramirez based on the fact that Ramirez, who was fluent in Spanish, would not speak to him in Spanish during the review. Clearly neither of these events could have happened unless the two had met during the review process.

[6] The BOP's agenda was later updated to include interviews with MLPs as part of any peer review, apparently in recognition that doing so was reasonable.

[7] In his deposition, Casiano admitted that he did not recall who specifically had told him this, so this must be considered as inadmissable hearsay.

before leaving the camp. The next day, AW Morlote met with Casiano and told him about the negative aspects of the peer review. Casiano maintains that AW Morlote threatened him during this meeting, telling him that his privileges were not going to be renewed, and that he should fake a heart attack and retire. AW Morlote purportedly also told Casiano that Dr. Ramirez had said that a second peer review would be a waste of time, as it would simply confirm his results. AW Morlote denies saying any of this, so these statement are in dispute. At the time, Casiano told no one about AW Morlote's alleged statements.

By letter dated June 11, 2002, Captain Kendig provided Warden Vasquez with a copy of Dr. Ramirez's formal written report, which contained the same conclusions as the earlier oral report. In this letter, Captain Kendig recommended that an internal medicine or family practice consultant be immediately added to the staff at Eglin. Captain Kendig also ordered Dr. Gene Roffers, the Clinical Speciality Consultant for the Southeast Region, to follow up with Casiano. On July 8, 2002, Dr. Ivan Negron was sent to FPC Eglin/Pensacola to deal with patients deemed beyond Casiano's competence. However, because he did not have access to the inmate numbers of the cases listed in Dr. Ramirez's report, he was not able to addressed the specific concerns cited by the review.[8] A copy of Dr. Ramirez's report, which did not contain the inmate numbers of the patients examined, was provided to Casiano on or about July 30, 2002.

A second peer review was then conducted by Dr. Gene Roffers ("Dr. Roffers"), the southeastern Regional Clinical Specialty Consultant, in October of 2002, and verified Dr. Ramirez's conclusions. Casiano contends that the BOP ordered the second review only in response to his filing of an EEO complaint, and that the review was a form of retaliation for his action. He says that the results of the second review were

---

[8] Two weeks after arriving at FPC Eglin/Pensacola, Dr. Negron was forced to leave due to an emergency at his home institution.

"preordained", as evidenced by the fact that Dr. Ramirez told AW Morlote that a second review would confirm his results. (Doc. 66, at 41) Casiano also contends that because he never received the inmate numbers from the cases Dr. Ramirez used in his report, he was unable to remedy any of the problems from the first review before the second review took place, and in any event, the fact that the purpose of Dr. Roffers' review was only to gauge his improvement since the last review means that it cannot corroborate Ramirez's review.

On December 3, 2002, Dr. Julia Berrios was appointed temporarily as Acting Clinical Director for FPC Eglin/Pensacola. On December 10, 2002, Captain Kendig formally denied Casiano's request to extend his privileges as Clinical Director at FPC Eglin/Pensacola.[9] Casiano was allowed to remain as a medical officer at the camps, however. In May of 2003, Dr. Luis Berrios ("Dr. Berrios"), a Puerto Rican born Hispanic, was named as Clinical Director for FPC Eglin/Pensacola.

In addition to resulting in the loss of his Clinical Director privileges, Dr. Ramirez's peer review negatively affected Casiano's status in the BOP in at least two other ways. First, in June of 2002 Casiano's quarterly evaluation was downgraded from "exceeds expectations" to "fully satisfactory." AW Morlote has indicated that this was done primarily to reflect the negative results of Dr. Ramirez's peer review.

Second, the negative peer review led to Casiano being denied a retention bonus for which he was otherwise eligible. When Casiano had started as Clinical Director at FPC Eglin/Pensacola, he had entered into a contract with the BOP under its Physician's Comparability Allowance Program ("PCAP"). PCAP is a BOP program designed to help lower physician turnover at BOP institutions. Under the program, a doctor agrees to remain at a particularly BOP institution for a set period of time, in exchange for which

---

[9] It is not clear exactly when the decision to deny Casiano's privileges was made. In an email to Lillian Jimenez dated September 30, 2002, Tom Gora, Chief of the BOP's Office of Quality Management, suggested holding off on a final decision regarding Casiano's privileges until it was known how Casiano would respond to the denial of his PCAP bonus. Gora's thinking, apparently, was that the PCAP denial might lead Casiano to quit as Clinical Director, making the privileging issue moot.

he receives a bonus if he fulfills the contractual requirements. At the end of this period of time, the arrangement can be renewed and an additional bonus received, but renewal is not automatic. A PCAP bonus agreement must be initiated by the Warden at the Clinical Director's local institution, and, unlike the privileging process, various individuals in the BOP hierarchy may recommend for or against granting this renewal.

Casiano's original PCAP bonus agreement was due to expire on September 10, 2002. In July of 2002, Casiano requested that his PCAP bonus be renewed. On August 1, 2002, Warden Vasquez submitted this request to the Regional Office, along with his recommendation that it be approved.[10] Then, on August 28, 2002, Warden Vasquez signed a memorandum, drafted by Jimenez, recommending that the PCAP bonus not be renewed, pending resolution of the issues raised in Dr. Ramirez's peer review. Regional Director Holt concurred in this negative recommendation, and sent the request to the BOP's Central Office. Central Office soon sent the request back unsigned, noting that the BOP will not enter into a PCAP bonus agreement unless the local warden approves.[11]

On August 29, 2002, Casiano contacted the BOP's Equal Employment Office ("EEO"), complaining that he had been discriminated against based on his age and national origin.  Casiano's formal complaint was filed with the EEO on November 29, 2002. Casiano's complaint listed as instances of discrimination the negative peer review by Dr. Ramirez, the fact that he did not receive a copy of Dr. Ramirez's report until two months after the peer review, the lowered July 2002 quarterly evaluation score, and the denial of his PCAP bonus. The complaint also recounted certain

---

[10] Vasquez contends that he was against the renewal of the PCAP all along, and that he only sent Casiano's request to the Regional Office because he mistakenly thought he had to. For purposes of summary judgment, this dispute will be resolved in the Plaintiff's favor. Whatley v. CNA Ins. Cos., 189 F.3d 1310, 1313 (11th Cir. 1999) (on a summary judgment motion, the record and all reasonable inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party).

[11] Casiano would eventually be approved for a new PCAP bonus in 2004.

incidents involving Jimenez which pre-date Casiano's tenure at FPC Eglin/Pensacola.[12] Casiano also contacted the EEO on two additional occasions, in August/September of 2003 and August of 2004, alleging further incidents of discrimination, which are more fully described below.

After his Clinical Director privileges were revoked, Casiano contends that various members of the BOP management team and others orchestrated an elaborate campaign to intimidate him into retiring. This campaign contained many parts. First, Casiano contends that soon after his privileges as Clinical Director were revoked, he was threatened with transfer by Warden Vasquez. Vasquez admits that the BOP briefly considered transferring Casiano to Pensacola in January of 2003, but decided against the move when it became clear that the BOP would not pay Casiano's moving expenses. He denies that this was in any way done in retaliation for Casiano's EEO filing.

Casiano also alleges that a mentoring program developed by BOP personal to help improve his medical knowledge and skills was a form of retaliation. After Casiano's privileges as Clinical Director were revoked, Captain Kendig instructed Dr. Roffers to create a mentoring program that would help correct Casiano's perceived deficiencies. Dr. Roffers submitted instructions for a mentoring program to the Acting Clinical Director at FPC Eglin/Pensacola in January of 2003.  In August of 2003, Dr. Berrios implemented a mentoring program with Casiano that was more stringent than the program originally proposed by Dr. Roffers. Under this program, Dr. Berrios routinely reviewed Casiano's work and prepared notes of any perceived deficiencies. The program continued until March of 2004. According to Casiano, the program was

---

[12]Prior to becoming Clinical Director at FPC Eglin/Pensacola, Casiano was Clinical Director for the Federal Correctional Institution at Marianna ("FCI Marianna"). Jimenez was Health Services Administrator for FCI Marianna during this period. According to Casiano, he was told by staff at FCI Marianna that Jimenez would periodically destroy paperwork in order to make it look as if the doctors at FCI Marianna had given inadequate consultation in a certain case. Casiano contends that he experienced this firsthand, when consultation documents he had prepared in a case mysteriously disappeared. Nevertheless, Casiano consistently received positive evaluations as Clinical Director at FCI Marianna and never complained to the BOP's EEO Officer about any allegedly discriminatory actions or statements.

intended as a means of overloading him with work, and that Dr. Berrios provided him with only minimal guidance.

Over the subsequent months, Casiano contends that officials at the BOP tried to wear him out as a means of getting him to resign. Arlene Balinao, the Health Services Administrator for FPC Eglin, contends that she was ordered by AW Jacobsen to overload Casiano with cases so that he would retire. She refused to do this, she said, but according to Casiano, Dr. Berrios was able to achieve something of the same result by verbally instructing him to provide care to patients assigned to Dr. Berrios. In addition, Casiano contends that he was excluded from work related meetings, that MLPs were instructed not to assist Casiano, and that his office was taken away from him.

Similarly, Casiano alleges that his schedule was repeatedly changed in order to make his job more difficult. In February of 2004, Casiano made a request through his union to have his schedule changed so that he would no longer have to travel back and forth between Pensacola and Eglin. Casiano also asked to be taken off of the call back rotation that the other MLPs were on. At the time, Eglin was experiencing a shortage of medical staff in the evenings due to the fact that most of the MLPs had negotiated a schedule through the union whereby they only worked during the day. AW Jacobsen initially considered granting Casiano's request, and moving him to a non-day schedule. However, both Dr. Berrios and then Regional Clinical Specialty Consultant Betzy Hernandez-Ricoff ("Hernandez-Ricoff") advised against this on the grounds that it would interfere with Casiano's mentoring program.[13] AW Jacobsen ultimately decided to leave Casiano's schedule unchanged.

Another alleged incident of discrimination involved the denial of overtime and compensatory pay. On the night of May 2, 2003, Casiano was called in to deal with

---

[13] During this period, Hernadez-Ricoff sent an e-mail regarding Casiano's purposed schedule change, in which she indicates that she had not been given any reason for the change, and speculates that it may have been done in an effort to get Casiano to resign.

an inmate who was having complications from knee surgery. Casiano worked that night for about two hours, and then went home. The next day, he applied for and received approximately $70 in overtime pay based on this work. However, because Casiano is a GS-15 level employee at the top of his pay grade, he was not eligible to receive this overtime pay, and the decision to grant his overtime application was in error. Human Resources at the camp soon realized this, and sent Casiano a letter telling him to return the money, which he did. Similarly, an award of compensatory time to Casiano based on the incident was latter found to be in error.

The BOP provides funds and compensatory time for certain continuing medical education courses for its physicians, though it reserves the right to deny funding in a particular case. In 2003, Casiano applied for a course in Rheumatology. Dr. Berrios denied funding for this course, on the grounds that Casiano had attended a similar course the year before. Casiano contends that this act was retaliatory.

On two occasions, Casiano contends that the BOP's administrative investigations system was used as a means of retaliation. The first cases involved allegations of staff misconduct resulting in the death of an inmate. In the summer of 2003, Gloria Tereshinski ("Tereshinski"), an agent with the BOP's Office of Internal Affairs ("OIA"), was assigned to investigate these allegations. As part of the investigation, Tereshinski twice attempted to interview Casiano about the incident. Tereshinski first interviewed Casiano on August 8, 2003. Towards the beginning of the meeting, Casiano asked to review the inmate's file and to speak with his attorney. Casiano was allowed to contact his attorney, but was informed by Tereshinski that as a bargaining unit employee, he was only entitled to have a union representative present for questioning, rather than his personal attorney. Because the inmate's file was not available, Tereshinski suspended the interview so as to give Casiano time to locate and review the file. Tereshinski's second interview with Casiano took place on October 23, 2003. The date for the interview was arranged via email correspondence between Tereshinski and AW Jacobsen during the period of October 8-11, 2003. Per

OIA policy, Casiano was not told of the interview beforehand. Both August 8, 2003, and October 23, 2003, were scheduled annual leave days for Casiano.[14] Casiano contends that these dates were specifically selected in order to harass him. He does not specifically include Tereshinski as a party to the BOP's alleged retaliatory plan.

Casiano also alleges discrimination in his July 19 through July 21, 2002, suspension from employment for inattention to duty. The investigation in that case was handled by a GS-9 investigator, and not by an OIA agent.[15] Casiano contends that he was denied access to medical records in the case, and that the fact that an OIA agent was not assigned to the case is evidence of discrimination.

Finally, Casiano contends that throughout his tenure at FPC Eglin various BOP officials made derogatory remarks about his age and nationality both to others and to him personally. For example, soon after starting as Clinical Director at FPC Eglin/Pensacola, Warden Vasquez saw Casiano driving to Eglin from Pensacola. Casiano was driving very slowly, causing a traffic backup. When Warden Vasquez got to the camp, he told Arlene Balinao about what he saw, to which she reportedly laughed and responded: "what do you expect from an old man?" (Gov. Exhibit 4, at 131). Arlene Balinao later reported the incident to Casiano, telling him Vasquez had said he was too old to drive, but it appears that the statement was hers.

Balinao also claims to have heard other discriminatory statement made about Casiano. According to Arlene Balinao, Warden Bauknecht, Jimenez, and Dr. Berrios each told her that Casiano was "too old to practice," and AW Jacobsen made statements like "He's too old. Why doesn't he retire." (Plaintiff's Exhibit A, 20-22) Warden Vazquez purportedly told Balinao that Jimenez told him Casiano's privileges would not be renewed and he should just retire. Arlene Balinao also claims to have

---

[14] As compensation for the missed annual leave, Casiano was given eight hours of comp time on October 24, 2003, and was granted leave from October 27, 2003, to October 31, 2003.

[15] OIA generally only performs about ten percent of investigations in the BOP. The rest are handled locally by an institution's Special Investigative Agent or Special Investigative Supervisor. The determination whether to assign an OIA agent to a case is made by the OIA.

heard from several physicians who were told by Jimenez that Casiano's position was going to be vacated prior to Casiano's receipt of the Ramirez peer review report.

Several other MLPs at FPC Eglin/Pensacola report having heard (or made) comments about Casiano's age. For example, Katherine Cheese reported that Dr. Ramirez asked her during the May 2002 peer review if Casiano's age was affecting his work. At one point, MLP Paul Diambra wrote "age and treachery will always win over youth and enthusiasm" on the clinic blackboard, a comment that Casiano says he took to be directed towards himself.  Antonio J. Larranaga, a former BOP contract physician, has alleged that Dr. Berrios once told him that "one of the reasons he was brought to FPC/Eglin/Pensacola was because of Dr. Casiano's age." (Gov. Exhibit 14, at 27-28) And, Hossam Georgy, a MLP at Eglin, said that various other MLPs at the camp often made comments to the effect that Casiano was too old and needed to retire.

Casiano also contends that some purportedly discriminatory comments were made to him personally. Soon after starting as Associate Warden at FPC Eglin, AW Jacobsen asked Casiano if he was a graduate of the Dominican Republic Medical School. Casiano took this to be a jab at his national origin, as well as a suggestion that he had gone to a substandard school.  Also, on two occasions, Warden Bauknecht asked Casiano when he was going fishing, which Casiano interpreted as a suggestion that he should retire.

## II.   DISCUSSION

### A.   Summary Judgment Standard

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Rule 56(c), Fed. R. Civ. P. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265, 273 (1986); see also Morisky v. Broward County, 80 F.3d 445, 447 (11th Cir. 1996).

However, summary judgment is improper "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 594 (11th Cir. 1995). An issue of fact is "material" if it might affect the outcome of the case under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202, 211 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. See id.; see also Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538, 552 (1986).

Conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact. See Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000); Ramsey v. Leath, 706 F.2d 1166, 1170 (11th Cir. 1983). On a summary judgment motion, the record and all reasonable inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party. Whatley v. CNA Ins. Cos., 189 F.3d 1310, 1313 (11th Cir. 1999).

B.    Motion to Strike

The Defendant has filed a motion to strike Exhibits A, G, V, and Y, as well as an affidavit filed by Antonio J. Larranaga, a former BOP contract physician. The motion also asks this court to strike the Plaintiff's statement of disputed fact in its entirety, or at least to strike 54 separate passages from the statement of facts that it considers especially egregious. The Defendant objects to most of the above documents on the grounds that they contain irrelevant information and inadmissible hearsay. As a general matter, a court may not consider evidence on summary judgment unless it can be reduced to an admissible form. See Macuba v. Deboer, 193

F.3d 1316 (11th Cir. 1999) (inadmissible hearsay cannot be considered on a motion for summary judgment). To the extent, therefore, that the Plaintiff's exhibits and statement of facts contain inadmissible, unsupported, or irrelevant statements, those statements will be disregarded for purposes of this motion.  To that extent, the defendant's motion to strike is granted.

Aside from the hearsay and relevancy objections, the Defendant has objected to several of the Plaintiff's exhibits on other grounds. First, the Defendant objects to Plaintiff's Exhibit A, an affidavit by Balinao, on the grounds that it was not disclosed by the Plaintiff during discovery. While the affidavit appears to have been sworn in December of 2004, before the end of discovery in this case, Casiano has indicated in a sworn statement that he did not receive a copy of the statement until July of 2005, and was not dilatory in providing the document to the Defendant or to this court. Drawing all inferences in the Plaintiff's favor for purposes of this summary judgment motion, I will consider those parts of the document that are otherwise admissible as evidence and that are relevant to the Plaintiff's claims.

Defendant next objects to Plaintiff's Exhibit G, which is the Plaintiff's response to the Defendant's first set of interrogatories. Rule 56(c) provides that a court may consider answers to interrogatories on summary judgment. See Fed. R. Civ. Pro. 56(c) ("The judgment sought shall be entered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (emphasis added).  However, answers to interrogatories are subject to the same requirements as an affidavit would be under Rule 56(e), and must be made on personal knowledge, and contain facts which could be converted into an admissible form at trial. Star v. Pearle Vision, 54 F.3d 1548 (10th Cir. 1995). Therefore, to the extent that the Plaintiff's answers to the interrogatories contain inadmissible material, the interrogatories will not be considered for purposes of this ruling.

Finally, Defendant objects to the affidavit of Antonio J. Larranaga on the grounds that it does not contain an averment that it is made with personal knowledge. Rule 56(e) of the Federal Rules of Civil Procedure requires that affidavits be made upon personal knowledge. The rule does not require that any particular form of words be used, however, and information in an affidavit may be considered on summary judgment even absent an explicit declaration of personal knowledge, so long as such knowledge can be demonstrated from the face of the affidavit itself. See Kemper v. Saline Lectronics, 348 F. Supp. 2d 897 (N.D. Oh. 2004); Lupo v. Wyeth-Ayerst Laboratories, 4 F. Supp. 2d 642 (E.D. Tex. 1997); McLaughlin v. Copeland, 435 F. Supp. 513 (D. Md. 1977). Larranaga's affidavit asserts that Dr. Berrios made the statement about Casiano's age to him personally. This is sufficient to establish personal knowledge.

      C.    Age Discrimination

The Age Discrimination in Employment Act of 1967 ("ADEA") prohibits age discrimination in employment against individuals who are at least 40 years of age. 29 U.S.C. § 621. A plaintiff may establish a claim of illegal discrimination under the ADEA through direct evidence. Wilson v. B/E Aerospace, 376 F.3d 1079 (11th Cir. 2004). Direct evidence is "evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." Damon v. Fleming Supermarkets of Florida, 196 F.3d 1354, 1358 (11th Cir. 1999). It is evidence of the sort that, if believed, would prove the existence of discriminatory retaliation without inference or presumption. Burrel v. Board of Trustees of Georgia Military College, 125 F.3d 1390 (11th Cir. 1997).

In his statement of disputed fact, Casiano has listed numerous examples of what he considers direct evidence of discrimination against him based on age. These include: (1) a statement by Warden Vasquez to Arlene Balinao about Casiano's driving; (2) statements allegedly made to Arlene Balinao by Warden Bauknecht, AW Jacobsen, Lillian Jimenez, Boyd, and Dr. Berrios, that Casiano was too old to practice medicine;

(3) a statement allegedly made by Lillian Jimenez to Warden Vasquez (and repeated by him to Arlene Balinao) that Casiano's privileges were not going to be renewed and that he should just retire; (4) a statement by Dr. Ramirez to Katherine Cheese, asking if Casiano's age was affecting his work; (5) Paul Diambra writing "age and treachery will always win over youth and enthusiasm" on the clinic blackboard; (6) a statement allegedly made by Dr. Berrios to Antonio J. Larranaga that one of the reasons Berrios had been brought to FPC Eglin/Pensacola was because of Casiano's age; (7) statements allegedly made by various MLPs at FPC Eglin that Casiano was too old and needed to retire; (8) a statement allegedly made to Casiano by AW Morlote suggesting that he fake a heart attack and retire; (9) a statement allegedly made by Dr. Ramirez to AW Morlote (and repeated to Casiano by AW Morlote) that it would be a waste of time to have a second peer review since it would only reach the same result as Dr. Ramirez's review; (10) statements by Warden Bauknecht asking Casiano on two occasions when he was going fishing; and (11) statements made in a September 30, 2002, e-mail by Tom Gora, indicating that Casiano might retire once his PCAP bonus was not renewed.

A statement cannot constitute direct evidence of discrimination unless it is unambiguously discriminatory and is made by a person involved in the allegedly discriminatory decision making process. See Earley v. Champion International, 907 F.2d 1077, 1081 (11th Cir. 1990)("[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age… constitute direct evidence of discrimination."); Standard v. A.B.E.L. Services, 161 F.3d 1318, 1330 (11th Cir. 1998) ("remarks made by non-decision makers or remarks unrelated to the decision making process itself are not direct evidence of discrimination.") Here, it is undisputed that Captain Kendig had the sole authority to decide whether to renew the Plaintiff's privileges as Clinical Director.

There is no evidence that Captain Kendig ever made discriminatory statements about Casiano's age or that he harbored an animus against Casiano on that account.

However, under the so-called "cat's paw" doctrine, the discriminatory animus of a subordinate may be imputed to a decision maker where the decision maker adopts the opinion of the subordinate as his own.[16] Llampallas v. Mini-Circuits Lab., 163 F.3d 1236 (11th Cir. 1998). In making his decision not to renew Casiano's Clinical Director privileges, Captain Kendig relied on the peer review reports provided by Dr. Ramirez and Dr. Roffers, and for that reason any discriminatory statements made by them may constitute direct evidence of discrimination.

In addition, Casiano argues that because Dr. Ramirez and Dr. Roffers conducted interviews with the MLPs at Eglin during their peer reviews, any statements made about Casiano by the MLPs should also be considered under the cat's paw doctrine. However, for the "cat's paw" doctrine to apply, the law in this circuit is settled that the decision maker in question must have not performed any independent evaluation of the situation. Id., at 1249. That is not the case here. Dr. Ramirez and Dr. Roffers did not simply adopt the conclusions of the MLPs in their peer reviews without independently examining their merits, and in any event, concerns about Casiano's management practices were only part of the basis for the review's negative conclusions. As for Warden Baukenecht, AW Jacobsen, AW Morlote, and Dr. Berrios, not only did they play no role in the decision making process regarding Casiano's privileges, but with the exception of AW Morlote, they did not even arrive at FPC Eglin until after that decision had already been made. Statements by such individuals cannot be fairly imputed to the Defendant in this case.

Casiano has not produced a single allegedly discriminatory statement from Dr. Roffers. The only evidence of age discrimination in the record with regard to Dr. Ramirez is that Dr. Ramirez asked one of the MLPs during the peer review whether

---

[16] The term "cat's paw" comes from the ancient fable where a crafty monkey tricks a cat into pulling chestnuts from a fire, which he then eats.

Casiano's age was affecting his work.[17] This is hardly an unambiguous expression of discriminatory animus. "Congress made plain that [ADEA] was not meant to prohibit employment decisions based on factors that sometimes accompany advancing age, such as declining health or diminished vigor and competence." Barnes v. Southwest Forrest, 814 F.2d 607 (11th Cir. 1987). The effects of age that may affect job performance are certainly proper personnel concerns. It was legitimate (and reasonable) for Dr. Ramirez to ask about how Casiano's advancing age was affecting his work, and the fact that he asked this question is not direct evidence of discrimination.

With regards to the non-renewal of Casiano's PCAP bonus, matters are more complicated. Captain Kendig was the ultimate decision maker here as well, though unlike with privileging, BOP policy does allow various members of the BOP administration to recommend for or against the renewal of a PCAP bonus. However, BOP policy also requires that a PCAP bonus agreement be initiated by the warden of the institution. Where a warden recommends against renewal, as Warden Vasquez did in this case, he functionally has a veto with regard to that issue. Further, while the record is not entirely clear on the point, there appears to be a genuine issue of fact about whether Warden Vasquez exercised his independent judgement in making this decision, or whether he merely signed the recommendation and memorandum written by Jimenez. Therefore, for purposes of this motion, I will attribute any discriminatory statements made by Jimenez to Warden Vasquez under the "cat's paw" doctrine.

Casiano's purported direct evidence of age discrimination consists in the description by Warden Vasquez of Casiano's slow driving, and the comments allegedly made by Lillian Jimenez that Casiano was too old to practice medicine and should retire. The Plaintiff does not contend that the slow driving by Casiano did not occur,

---

[17] Dr. Ramirez also purportedly told AW Morlote that it would be a waste of time to conduct a second peer review, since it would reach the same conclusions as his review. Whatever else this may be evidence of, it in no way involves Casiano's age, and certainly cannot be taken as direct evidence of discrimination.

but rather that Vasquez implied that Casiano was too old to drive with the flow of traffic. The evidence, however, reflects that it was Balinao and not Vasquez who said this. In any event, the fact that Warden Vasquez made a factually true observation about Casiano's slow driving several years before he recommended against renewing Casiano's PCAP bonus is not necessarily indicative of anything, even if it could be classified as discriminatory, absent some showing that the two events are causally connected. See  Simmons v. Oce-USA, 174 F.3d 913 (8th Cir. 1999) (racist joke made two years prior to firing decision not direct evidence of discrimination). Lilian Jimenez's comments, however, require a more in depth analysis.

The determination of whether statements constitute direct evidence of discrimination is never easy, and is even less so in the context of age discrimination. See, e.g., Dilla v. West, 4 F. Supp. 2d 1130, 1137 (M.D. Ala. 1998), aff'd 179 F.3d 1348 (11th Cir. 1999) ("[T]he determination of whether the plaintiffs have established age discrimination by direct evidence is somewhat complicated by the fact that the definition of what constitutes direct evidence of discrimination is subject to frequent shifts, even among different panels of the Eleventh Circuit Court of Appeals.") Further, as juries are routinely instructed, the law makes no distinction between the weight to be given to either direct or circumstantial evidence.  Thus, the artificial elevation of the so-called "direct" evidence in discrimination cases is difficult to justify in evidentiary theory and more difficult to actually apply in practice.

The ADEA prohibits employers from discrimination against employees over 40 based on age, but it does not prohibit employment decisions based on the decline in health, vigor, or competence that often accompany advancing age. See Barnes, supra, 814 F.2d at 607. Often times, these legitimate concerns can be expressed in language virtually indistinguishable from what in other contexts would be clear examples of direct evidence of discrimination. A supervisor who says that a particular employee is "too old" for a particular job may be expressing ageist sentiments, or he may simply be noting that the employee can no longer adequately perform his job duties due to the

decrease in vigor that normally accompanies aging. Direct evidence analysis should not be used as a way of playing "gotcha" with employers. For that reason, the direct evidence analysis must take account of the broader context behind particular remarks, rather than viewing them in isolation.

In this case, the Plaintiff was born April 12, 1929, and is actually 76 year of age - - - an age that even in light of today's extended longevity and productivity is rare in the workplace generally, and even more rare among BOP employees. The Plaintiff admits that his advancing age has adversely affected his abilities, and there were serious concerns by BOP personnel about his competence. The BOP has a Constitutional responsibility to ensure that federal prisoners receive adequate medical attention and care. The failure to provide adequate and competent medical care not only endangers the health and life of prisoners, but also exposes the BOP to the possibility of civil liability as a violation of the United States Constitution.

Under these circumstances, it is impossible to say that Ms. Jimenez's statements are really direct evidence of discrimination. Her comments are certainly circumstantial evidence of discrimination, and should be taken into account, but given the facts of this case, construing Jimenez's comments as directly establishing discrimination requires the inference that she was not possibly referring to the effects of Casiano's age on his general competence, rather than expressing a discriminatory animus.[18]  None of these statements rise to the level of constituting direct evidence of establishing discrimination.

A plaintiff may also establish a disparate treatment claim by circumstantial evidence according to the framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1981). This requires a three-step process. First, the plaintiff must establish a prima facie case of discrimination. Id., at

---

[18] Casiano's Statement of Disputed Facts also recounts allegations of improper behavior by Jimenez while she was Health Services Administrator for FCI Marianna. These allegations are based on hearsay, do not relate to Casiano's age discrimination claims, and will not be considered for purposes of this motion.

802. Once the plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for its actions. Id., at 802-03. If the defendant can provide a legitimate reason for its actions, the burden shifts back to the plaintiff, who must then prove that the articulated reason for the defendant's action was pretextual, and that the real motivation for the termination was discriminatory. Id., at 804; St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). This may be done directly, by showing that a discriminatory reason more likely motivated the defendant's actions, or indirectly, by showing that the proffered reason for the defendant's actions is not worthy of belief. Hall v. Alabama Association of School Boards, 326 F.3d 1157 (11th Cir. 2003).

A plaintiff can show a prima facie case of discrimination based on circumstantial evidence if he can show: (1) that he is a member of a protected class; (2) that he was subject to adverse employment action;  (3) that he was qualified for the position; and (4) that he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated employee outside his protected class. Chapman v. AI Transportation, 229 F.3d 1012 (11th Cir. 2000). The burden of demonstrating a prima facie case is not onerous, and requires only that a plaintiff establish facts adequate to permit an inference of discrimination. Holifield v. Reno, 115 F.3d 1555 (11th Cir. 1997).

Casiano is 76 years old, and thus is a member of a protected class. Casiano's replacement, Dr. Berrios, is significantly younger than Casiano, and thus meets the fourth element of a prima facie case of age discrimination. Carter v. DecisionOne Corp., 122 F.3d 997 (11th Cir. 1997) (holding that a 42 year old plaintiff replaced by a 39 year old employee meets requirements for prima facie case of age discrimination).

Employment action can constitute adverse action if it serves to materially change the terms, conditions, and privileges of employment. See Davis v. Town of Lake Park, Florida, 245 F.3d 1232 (11th Cir. 2001). The non-renewal of Casiano's

privileges as Clinical Director clearly meets this test, as it is the functional equivalent of a demotion from the position of Clinical Director to that of an ordinary physician at FPC Eglin/Pensacola. The non-renewal of Casiano's PCAP, however, is another matter. The denial of a bonus does not constitute adverse action where the employee is not automatically entitled to the bonus. Rabinovitz v. Pena, 89 F.3d 482 (7th Cir. 1996). The purpose of the BOP's PCAP program is to retain qualified physicians by promising them bonuses if they agree to stay at a particular BOP institution for a set amount of time. The program is completely discretionary, and if the BOP decides, for whatever reason, that ensuring the retention of a particular physician is not worth the cost of the bonus, it is free to decline or fail to renew a physician's participation in that program. Therefore, the fact that Casiano's PCAP bonus was not renewed cannot constitute an adverse employment action.

The Defendant contends that the negative peer reviews conducted by Dr. Ramirez and Dr. Roffers establish that Casiano was not qualified for his job as Clinical Director. However, the Eleventh Circuit has held that where a plaintiff is discharged from a position, rather than denied some promotion or benefit, the plaintiff need not prove that he was qualified for the position in order to establish a prima facie case. Damon v. Fleming Supermarkets of Florida, 196 F.3d 1354 (11th Cir. 1999). It is unclear whether the failure to renew clinical privileges which are set to expire is equivalent to a failure to hire or a termination. Nevertheless, since the denial of privileges was based on peer reviews that Casiano contends were themselves discriminatory, it would be inappropriate to treat those reviews as positively establishing that Casiano was unqualified for his job as Clinical Director. See Sledge v. Goodyear Dunllop Tires North America, 275 F.3d 1014 (11th Cir. 2001) (fact that plaintiff failed written examination did not establish he was unqualified for position where exam itself was simply claimed a pretext for discrimination). The question of the Plaintiff's qualifications are at the heart of this litigation. For purposes of establishing a prima facie case, I will assume that the Plaintiff at least meets the

minimum professional qualifications.

The peer reviews are relevant, however, to the question of whether the BOP had a legitimate, non-discriminatory reason for choosing not to renew Casiano's privileges as Clinical Director. In his memorandum in opposition to summary judgment, Casiano contends that the negative peer reviews should not be considered a legitimate grounds for denying Casiano's privileges, because the peer review program developed by Captain Kendig was not formally adopted as BOP policy until 2005. In addition, Casiano argues, somewhat paradoxically, that the reviews were deficient in that they deviated from this unsanctioned review process. Neither argument has merit. A plaintiff cannot establish pretext merely by showing that the employer did not place the reasons that factored into its termination decision in writing. J.A. Beaver v. Rayonier, 200 F.3d 723 (11th Cir. 1999). Nor do deviations from a company policy, standing alone, serve to demonstrate discriminatory animus.  Mitchell v. USBI, 186 F.3d 1352, 1355-56 (11th Cir. 1999).

Looking at the substance of Dr. Ramirez's deviations from the review agenda authorized by Captain Kendig, I find nothing that would imperil the legitimacy of the review. Drawing all inferences in favor of the Plaintiff, it appears that Dr. Ramirez did not spend as much time with Casiano personally as was called for by the official agenda, that he interviewed MLPs at the camp, even though this was only later added as a part of the peer review agenda, and he selected the cases for his review, whereas the official agenda calls for the Clinical Director to select the cases. None of these changes indicates that the review process was unreasonable, or that Dr. Ramirez did such a poor job of investigating the facts as to render his conclusions invalid. According to Captain Kendig, he expected reviewers to use their discretion in conducting peer reviews, rather than following a hidebound approach. More to the point, what matters is not whether Dr. Ramirez followed the program guidelines to the letter, but whether his review was factually truthful and provides an adequate basis for Captain Kendig to deny Casiano's privileges. Id. Dr. Ramirez's review was thorough

and comprehensive, and his conclusions appear to have a solid factual basis in the record. Any doubts about Dr. Ramirez's conclusions are resolved by Dr. Roffers' review, which corroborated Dr. Ramirez's findings.[19] There is no evidence, direct or circumstantial, to suggest that either Dr. Ramirez or Dr. Roffers harbored any discriminatory animus against Casiano, and their conclusions provided ample grounds for Captain Kendig to not renew Casiano's privileges as Clinical Director.

Casiano argues that even if the negative peer reviews provided a legitimate basis for not renewing his privileges, this was not the actual reason why this was done. As evidence for this contention, Casiano cites the fact that Captain Kendig did not take immediate action to deal with the risks indicated by Dr. Ramirez's report. However, the BOP did send Dr. Negron to FPC Eglin within a month of Captain Kendig's letter, and while Casiano's continuation as Clinical Director did apparently pose serious risk management concerns, in the short term those concerns could be mitigated by having Casiano continue to refer patients to outside specialists. Bureaucracies are not known for their speed of action, and the BOP's a delay of a few weeks is not indicative of any lack of seriousness in the report's conclusions.

Since there is no genuine issue of material fact with respect to whether  Captain Kendig bore any discriminatory animus against Casiano due to his age, or whether either Dr. Ramirez or Dr. Roffers bore any such animus, or whether Captain Kendig's reliance on the two peer reviews was pretextual, or whether the peer reviews themselves were anything other than an honest and thorough evaluation of Casiano's medical and leadership abilities, the Defendant's motion for summary judgment must be granted as a matter of law.

---

[19] Relying on Dr. Ramirez's alleged statement to AW Morlote that a second review was not needed as it would only confirm the results of the first, Casiano argues that the results of the second review were "preordained," and thus not probative of this abilities as Clinical Director. As with many of the other statements in this case, Casiano has attached a far darker connotation to Dr. Ramirez's remarks than is warranted. Aside from the fact that the statement is double hearsay and of dubious admissibility, the statement was probably not meant to imply that Dr. Ramirez had such broad control over the BOP that he could dictate the results of any peer review. Rather, in all likelihood Dr. Ramirez was simply expressing confidence in his conclusions, stating that any other reviewer would reach the same conclusions not because of a pre-arranged conspiracy, but because they were so obviously correct.

D.     <u>National Origin Discrimination</u>

Casiano has also alleged a claim of disparate treatment based on national origin under Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e-2(a)(1). Generally, Title VII and ADEA apply the same legal principles and standards to disparate treatment claims. <u>See</u> <u>McPherson v. University of Montevallo</u>, 922 F.2d 766 (11th Cir. 1991). As with ADEA, a plaintiff may prove his claim with direct evidence, if he can produce statements by the defendant that prove discrimination without inference or presumption. <u>Wilson v. B/E Aerospace</u>, 376 F.3d 1079 (11th Cir. 2004).

As direct evidence of discrimination based on national origin, Casiano cites (1) "rumors" that Dr. Ramirez was the BOP's "hatchet-man" with a history of giving negative peer reviews to Hispanics; (2) the fact that Dr. Ramirez refused to speak Spanish with Casiano during the peer review; and (3) a question by AW Jacobsen, asking him whether he was a graduate of the Dominican Republic Medical School. Obviously the "rumors" about Dr. Ramirez's reputation as a "hatchet-man" are a classic example of inadmissible hearsay, and may not be considered at summary judgment. As for AW Jacobsen's question regarding Casiano's education, perhaps the comment was a backhanded suggestion that Casiano may not have attended a very good medical school, but more than likely it was simply a friendly and innocent question. Either way, there is no basis for drawing an inference that Casiano's national origin (Puerto Rican) was the object of the remark, and it certainly is not direct evidence of discrimination on the part of the BOP.[20] That leaves Dr. Ramirez's refusal to speak with him in the Spanish language during the peer review as the Plaintiff's evidence of discriminatory intent. Needless to say, it is not. Thus, there is nothing in the evidentiary record that can be characterized as direct evidence of national origin discrimination.

Nor can Casiano prove his national origin discrimination claim through

---

[20] Further, since AW Jacobsen played no role in the decision making process regarding Casiano's privileges and PCAP bonus, any discriminatory statements made by him cannot be imputed to the Defendant.

circumstantial evidence. There is no dispute that, as a Puerto Rican born-Hispanic, Casiano is a member of a protected class. The non-renewal of Casiano's Clinical Director privileges constitutes adverse employment action. See Davis, supra, 245 F.3d at 1232. And, as discussed above, for purposes of this motion, I will assume that Casiano was qualified to receive renewed privileges as Clinical Director. However, Casiano cannot establish the fourth element of a prima facie case of discrimination.

The fourth element necessary for a prima facie case can be established in one of two ways. First, a plaintiff can show that he was replaced by someone outside his protective class. Cuddeback v. Florida Board of Education, 381 F.3d 1230 (11th Cir. 2004). Second, he can show that he was treated less favorably than some other similarly situated employee. Gillis v. Georgia Department of Corrections, 400 F.3d 883 (11th Cir. 2005). For a BOP employee to be similarly situated to Casiano, he must be nearly identical to Casiano in all relevant respects. Wilson v. B/E Aerospace, 376 F.3d 1079 (11th Cir. 2004). Otherwise the courts applying Title VII would be forced to second-guess the reasonable employment decisions of employers, which was not the intent of the law. Id.

Dr. Berrios, who replaced Casiano as Clinical Director at FPC Eglin/Pensacola, is, like Casiano, a Puerto Rican-born Hispanic. Thus, the Plaintiff immediately faces a very high hurdle on this claim, for he was not replaced by someone outside his national origin class. To attempt to establish a prima facie case of national origin discrimination, Casiano has tried to identify some similarly situated BOP employee who was treated more favorably than Casiano, and who is not Puerto Rican. For this, Casiano has selected "Physician C", a Caucasian physician working as a Clinical Director for the BOP. Physician C was given a negative peer review by Dr. Ramirez, but nevertheless had his Clinical Director privileges renewed for a year pending further assessment.

While it is true that both Casiano and Physician C were criticized in their respective peer reviews for the same types of deficiencies, there is a significant

difference in the degree of these criticisms. For example, in portion of the review report titled "Physician Skills", Physician C's report states that he "needs to become more knowledgeable in basic chronic care as outlined in BOP Clinical Practice Guidelines," and "should become more directly involved in managing the sickest inmates at the institution." (Plaintiff's Exhibit C, at 6) In Casiano's review, by contrast, the same section states "The Clinical Director is an orthopedic surgeon and possesses limited basic internal medicine or infectious disease knowledge. He would need intensive retraining to meet the needs as a consultant in basic general medical care." (Gov. Exhibit 1, Tab 28, at 10)   Additionally, some of the negative aspects of Casiano's peer review are not reflected in Physician C's peer review. For example, Casiano was criticized for poor record keeping and for making only rare patient evaluations, whereas Physician C's review indicated no similar problems in these areas. Because of these differences, Casiano is simply not similarly situated to Physician C for purposes of his national origin discrimination claim. And, since Casiano has identified no other similarly situated BOP employee who was treated more favorably than he was, he has not established a prima facie case of discrimination. His national origin discrimination claim must, therefore, fail.

     E.   <u>Retaliation</u>

Section 704(a) of Title VII makes it unlawful for an employer to take adverse employment action against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this [title]."  42 U.S.C. § 2000e-3(a). Counts III and IV of Casiano's complaint allege numerous purported instances of retaliation based on his filling charges of age and national origin discrimination with the EEO. Specifically, Casiano contends that because he filed his complaint with the EEO, the BOP has retaliated against him by: (1) conducting a second peer review; (2) not renewing his PCAP bonus; (3) threatening him with transfer and changed work schedules; (4) overloading him with cases; (5) instructing the MLPs at Eglin not to assist him in handling cases; (6) excluding him

from work related meetings; (7) denying him an office; (8) denying him overtime and compensatory pay; (9) placing him in a mentoring program developed by Dr. Berrios; (10) refusing to pay for proper continuing medical education; (11) harassing him using the BOP's administrative investigations system; and (12) cancelling his annual leave without notice.

A plaintiff alleging discrimination on the basis of age or national origin must consult an EEO counselor within 45 days of the alleged adverse action. 29 C.F.R. § 1614.105(a)(7). Prior to filing a retaliation claim in federal court, a plaintiff must file a charge of discrimination with the EEO. Gregory v. Georgia Department of Human Resources, 355 F.3d 1277 (11th Cir. 2004). Where an EEO complaint is filed, a court may consider only those discrete acts of discrimination which are included in the EEO complaint. National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).[21] While Morgan involved time barred acts that occurred prior to the filing of an EEO complaint, the holding of the case applies equally to time barred acts occurring after a complaint has been filed. See Martinez v. Potter, 347 F.3d 1208, 1210-11 (10th Cir. 2003) (the rule in Morgan "is equally applicable… to discrete claims based on incidents occurring after the filing of Plaintiff's EEO complaint.") (emphasis in original). With the exception of the non-renewal of Casiano's PCAP bonus and Dr. Roffers' peer review, none of the alleged instances of retaliation were included in his EEO complaint.[22] Thus, my consideration of Casiano's retaliation claims must be limited to those two instances of alleged discrimination.

To make out a prima facie case of retaliation, Casiano must show: (1) that he engaged in protected activity; (2) that he suffered adverse employment action; and (3)

---

[21] Evidence of additional acts of discrimination may, of course, be used as background evidence in support of timely retaliation claims. Morgan, supra, 536 U.S. at 114.

[22] Casiano claims that he was told by the EEO that he did not need to file a separate complaint based on these new instances in a letter dated September 10, 2003. However, EEO interpretations of Title VII are not subject to deference by the courts, and are entitled to respect only to the extent they have the power to persuade. Morgan, supra, 536 U.S. at 110 n. 6.

that there is some causal relation between the two events. Olmsted v. Taco Bell, 141 F.3d 1457 (11th Cir. 1998). For employer action to be considered adverse action under Section 704(a), it must be objectively serious, and tangible enough to alter the employee's compensation, terms, conditions, or privileges of employment. Gupta v. Florida Board of Regents, 212 F.3d 571 (11th Cir. 2000).

The record reflects that a prima facie case of retaliation has not been established with regard to either the second peer review or the denial of his PCAP bonus. There is no question that by contacting the EEO and filing a complaint Casiano was engaging in protected expression. Pipkins v. City of Temple Terrance, Fla., 267 F.3d 1197 (11th Cir. 2001) (filing a complaint with the EEO is protected expression under Title VII). In addition, there is some evidence that the BOP did not originally plan a second peer review. There is also some indication that Warden Vasquez originally planned to recommend approval for Casiano's PCAP bonus, but later changed his mind. However, neither a negative peer review nor the denial of a discretionary bonus constitutes adverse employment action. Lucas v. W. W. Grainger, 257 F.3d 1249 (11th Cir. 2001)(negative peer review is not adverse action); Rabinovitz, supra, 89 F.3d at 482 (denial of discretionary bonus is not adverse action).[23]   Casiano's retaliation claims are, therefore, insufficient.

## III.   CONCLUSION

For the above reasons, The Defendant's motion for summary judgment (Doc. 47) is GRANTED as to all of the Plaintiff's counts. The Clerk shall enter judgment accordingly.

DONE AND ORDERED this 31st day of January, 2006.

/s/ Roger Vinson
**ROGER VINSON**
**Senior United States District Judge**

---

[23]   Further, what determined the non-renewal of Casiano's PCAP bonus was the negative recommendation of Warden Vasquez, which was made on August 28, 2002, one day before Casiano's first contact with the EEO. As a matter of fact, Warden Vasquez could not have retaliated against Casiano on August 28, 2002, for actions Casiano did not take until August 29, 2002.